UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

01 OCT -4 PM 4: 18

CLARENCE HADDOX
CLERK, U. S. DIST. CT.
S.D. OF FLA - MIA

WEBSITE BILLING.COM, INC.,

    Plaintiff,

v.

VISA U.S.A., INC. and VISA INTERNATIONAL
SERVICE ASSOCIATION, INC.,

    Defendants.

Case No. 01 - 7563

CIV - HUCK

MAGISTRATE JUDGE
BROWN

**COMPLAINT**

Plaintiff, Website Billing.com, Inc. ("Website Billing"), sues Visa U.S.A., Inc. ("Visa USA") and VISA International Service Association, Inc. ("Visa International")(Visa USA and Visa International are hereinafter sometimes referred to collectively as "Visa"), and alleges:

<u>Nature of Case</u>

1.    Website Billing is seeking a declaration of its rights as a merchant under Visa's rules and regulations governing credit card transactions as well as damages and injunctive relief resulting from Visa's unlawful and malicious conduct. As more fully explained below, Website Billing has been subject to the arbitrary and capricious application of Visa's rules and regulations, and the fines Visa has imposed (and threatens to impose) against Website Billing under such rules and regulations constitute unenforceable penalties under Florida law. Immediate judicial redress is necessary to remedy the substantial injustice Visa has created and to prevent further irreparable harm.

## Parties, Jurisdiction and Venue

2.     Website Billing.com, Inc. is a Florida corporation with its principal place of business located in Hollywood, Florida.

3.     Visa U.S.A., Inc. is a Delaware corporation with its principal place of business located in San Francisco, California.

4.     Visa International Service Association, Inc. is a Delaware corporation with its principal place of business located in San Francisco, California.

5.     Visa U.S.A. and Visa International are subject to the personal jurisdiction of this court under §§ 48.193(1)(b), (i)(g) and 48.193(2) because both entities have committed tortious acts in this state, both entities have breached contracts in this state by failing to perform acts required to be performed in this state, and because both entities engage in substantial and not isolated activities within the State of Florida.

6.     This court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties and because the amount in controversy exceeds $75,000.00, exclusive of interest, costs and attorney's fees.

7.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to this Complaint occurred in this district and because defendants are subject to the personal jurisdiction of this Court.

## General Allegations

8.     On or about November 17, 1999, Website Billing entered into a Merchant Processing Agreement ("Merchant Agreement") with Ocean Bank in Miami, Florida pursuant to which Website Billing agreed, *inter alia*, to honor credit card transactions from customers, and Ocean Bank agreed,

*inter alia*, to accept all sales drafts generated in compliance with the Merchant Agreement and deposited by Website Billing.[1] A copy of the Merchant Agreement is attached hereto as Exhibit "A."

9. The Merchant Agreement is expressly subject to the "bylaws, rules and regulations promulgated by Visa" ("Visa Rules and Regulations"). See Merchant Agreement, ¶ 10.1. Nevertheless, and despite its repeated written demands, Website Billing has never been provided with a copy of, or been given access to, such rules and regulations.

10. Pursuant to the Merchant Agreement, Website Billing agreed to pay Ocean Bank a "Chargeback Fee" in the amount of $15 in connection with customer "Chargebacks." The Merchant Agreement defines "Chargeback" as a "procedure by which a Sales Draft (or disputed portion thereof) is returned to bank by a Card Issuer because such item does not comply with the applicable Card plan's operating regulations. See Merchant Agreement ¶ 1.8. At the time of entering into the Merchant Agreement, Website Billing understood that this chargeback fee was its only exposure in connection with possible chargebacks. Website Billing was never advised by Visa or any Visa member that excess chargebacks would result in other penalties or charges until such penalties and charges were actually threatened or levied – long after appropriate remedial measures could have been taken.

11. Upon information and belief, Ocean Bank was required to become a "Visa Member" by entering into one or more agreements with Visa USA and Visa International in order to be able to enter into merchant processing agreements (such as the one at issue). As a Visa member, Ocean

---

[1] In general, merchant processing agreements allow for consumer credit card transactions to take place. Such transactions essentially involve four parties: (1) the customer cardholder who makes the purchase; (2) the merchant (Website Billing) who receives funds for goods or services provided; (3) the credit card processor (Ocean Bank) which funds the merchant; and (4) the issuing bank which receives payment from the cardholder and in turn funds the processor.

Bank acts as an agent of Visa USA and Visa International with respect to the processing of credit card transactions.

### Website Billing Begins Processing Transactions Under the Merchant Agreement

12.    Within two weeks after entering into the Merchant Agreement, Website Billing began processing Visa credit card transactions through Ocean Bank.  Over the next several months, Website Billing was developing itself as a technological leader in e-commerce transactions with revenues growing from roughly $300,000 per month in December 1999 to over $700,000 per month in June 2000.  During that period, 60 to 70% of Website Billing's revenues were attributable to Visa credit card transactions.

13.    Throughout this period of growth, Website Billing had virtually no contact or communication with Visa except with respect to the day-to-day processing of transactions.  Website Billing never received as much as a comment from Visa during this time period, let alone a complaint or objection to any of its transactions.

### Visa First Notifies Website Billing of Excess Chargebacks

14.    Website Billing's first communication with Visa (apart from day-to-day operations with Ocean Bank), came in or about July 2000, when Ocean Bank, on behalf of Visa, notified Website Billing that during the month of May 2000, Website Billing's ratio of international chargebacks to international transactions exceeded 5%. [2]

15.    Ocean Bank further explained – for the first time – that as a result of these "excess" chargebacks, Website Billing could be subject to penalties under the following Visa rule:

---

[2]  Chargebacks during the month of June would have related to transactions occurring as early as March 2000.

If a merchant's ratio of chargebacks from international transactions to overall international transactions exceeds 5.0%,[3] then Visa imposes a penalty of $100.00 per chargeback. If the merchant's chargeback ratio exceeds 2.5% in the fourth, fifth or sixth month following the initial penalties, then the per chargeback penalty is increased to $150.00.

16.   Website Billing responded to this notification by expressing surprise not only that it had not previously been advised of this rule, but at the size of the penalty since it was so disproportionate to, and bore no relationship to, the amount of the underlying transactions.

17.   Website Billing also expressed further shock about the lack of any standards and procedures in place by Visa for the authentication of transactions or for the resolution of transaction disputes, such as those which exist for traditional brick and mortar merchants.

18.   Ultimately Website Billing determined that the so-called excess chargebacks were occurring as a result of rampant fraud being perpetrated by consumers in certain countries involving the use of stolen credit card numbers.

19.   Indeed, after researching the issue, Website Billing advised Visa that it had become aware of numerous websites which generated valid Visa credit card numbers and which consumers would use to process fraudulent transactions over the internet. Website Billing provided a website address for one of these sites directly to Visa with the hopes that Visa would address this problem.

20.   Despite being advised of this fraud, Visa did not appear to take any action to protect its on-line merchants from the further perpetration of this fraud.

---

[3]   As explained below, Website Billing later learned that effective January 1, 2001, Visa was lowering this ratio to 2.5% for merchants engaged in certain industries, such as telemarketing and gambling. Although Website Billing is not engaged in either of these businesses, Visa applied this lower ratio to Website Billing.

21.    Instead, Visa's only suggestion for dealing with the problem was to have Website Billing implement a card verification procedure known as CVV2.  Using the CVV2 procedure, Website Billing would be able to verify that the consumer had actual possession of the credit card being used because the procedure requires that the consumer identify a code number printed, but not embossed, on the credit card itself.

22.    Website Billing understood that all Visa issuing banks were required to authenticate all charges under this system, thereby eliminating chargebacks resulting from alleged "unauthorized use of card" or from a consumer's claim that "I didn't do it."

23.    Website Billing immediately implemented the CVV2 procedure for all credit card transactions.

<u>Visa Notifies Website Billing that Excess Chargebacks Were Continuing</u>

24.    Despite Website Billing's implementation of the CVV2 procedure, in or about September 2000, Visa again advised Website Billing that its chargebacks were continuing to exceed acceptable levels.

25.    In evaluating the actual chargebacks, however, Website Billing found that a significant number of Visa issuing banks were actually not participating in the CVV2 program, including a majority of international banks.  Accordingly, and despite Visa's representations to the contrary, the program was not preventing fraudulent transactions from occurring.

26.    Additionally, Website Billing's research revealed that a significant number of the so-called chargebacks arose from transactions where Website Billing had actually authenticated the sale and had received a CVV2 match from the Visa card issuer.

27.   Thus, even though Website Billing authenticated and verified the charge through a Visa member bank, Visa was nevertheless refusing to honor the charge.

### Website Billing Develops its Own Neural Technology Fraud Detection System

28.   Recognizing that Visa's efforts to combat consumer fraud were failing, Website Billing began to develop a comprehensive fraud detection system of its own, which it described in detail to Visa and which was implemented by late September 2000.

29.   Website Billing's Neural Technology System utilized artificial intelligence to develop a database which would allow it to identify unusual patterns of names, card numbers and computer networks. Through this system, Website Billing was able to detect suspicious fraudulent activity and thereby reject transactions in real time in advance of being processed.

30.   Although Website Billing was confident that its new fraud detection system would eliminate most, if not all truly fraudulent transactions (as opposed to transactions involving "friendly fraud"),[4] the result of the system would obviously not be evident for several months because of the delays incident to the chargeback process. Website Billing was also aware of the fact that the implementation of this system would result in a decrease in the number of total transactions being processed, thereby causing its chargeback ratio to appear artificially high, as chargebacks trailed transactions by several months.

---

[4]  "Friendly fraud" is a term of art used in the industry to describe a fraudulent transaction in which the consumer charges on on-line transactions, and then later claims "I didn't do it," often even after the goods or services have been provided. Because of the absence of a paper trail in on-line transactions, this type of fraud is currently flourishing and unlike traditional fraud, Visa is improperly forcing merchants to assume the risk of "friendly fraud."

<u>Visa Threatens to Impose Fines Despite Website Billing's Efforts</u>

31.    Despite Website Billing's implementation of its cutting edge technology, Visa nevertheless advised Website Billing (through Ocean Bank) that if its ratios did not meet acceptable levels in November 2000, Website Billing would not only be fined $100 for each chargeback in November, but that it would be fined $100 for every chargeback dating back to June 2000.

32.    It was as if Visa was oblivious to Website Billing's efforts to curb Visa customer fraud as well as its own obligation to provide merchant protection.

33.    In addition to insisting that Visa reevaluate its position because of Website Billing's efforts to combat fraud, Website Billing discovered that Visa was actually penalizing Website Billing for duplicative chargebacks.  Also, because hundreds of the chargebacks involved transactions for which Website Billing had already issued a credit to the consumer, no chargeback was even justified or warranted under Visa's own rules.

34.    Thus, most of the chargebacks at issue should not have even been considered "chargebacks."   Excluding these "chargebacks" from Website Billing's chargeback ratio would have undeniably brought Website Billing under the acceptable chargeback threshold.

35.    Despite Website Billing's frustration, and as part of its continuing effort to demonstrate its commitment to combating fraud, Website Billing initially discontinued accepting <u>any</u> transactions originating from ten different countries where the highest number of chargebacks were originating. Additional countries were later dropped as well as chargeback patterns were detected.  As a result of this action, Website Billing's total international transactions (and thus its revenues) dropped significantly after December 2000.

## Visa Notifies Website Billing that Chargeback Fines Will Be Imposed

36.    Remarkably, in late January 2001 – over two months after the fact –  Visa (through Ocean Bank) advised Website Billing that because its November 2000 chargebacks exceeded the 5% threshold, it intended to impose substantial penalties.  This notification was confirmed  by letter dated February 28, 2001 in which Visa advised Website Billing that it was levying fines against Website Billing by automatically debiting its account in the amount of $126,600.00 covering all chargebacks occurring between June 1 and November 30, 2000, including all of the disputed chargebacks, all reversed chargebacks, all chargebacks authenticated using CVV2, and all chargebacks that fell within the acceptable chargeback threshold.

## Visa Refuses to Meet with Website Billing to Address the Consumer Fraud Issue

37.    Despite Website Billing's good faith efforts and its repeated requests to meet in person with Visa throughout this entire time period, Visa refused.  Because of the obvious challenges incident to processing electronic on-line transactions, particularly with regard to consumer identification and user authentication, Website Billing stressed to Visa the importance of Visa's need to address these challenges with appropriate parameters and measures, including specifically the implementation of procedures for the authentication and verification of transactions.  Visa simply ignored Website Billing's pleas.

## Website Billing's Further Attempts at Tackling the "Excess" Chargeback Problem

38.    Recognizing that Visa was not willing to cooperate with Website Billing or assist it in developing further systems to combat  fraud and to validate and authenticate on-line transactions, Website Billing was essentially left with no choice but to either discontinue accepting international transactions (which would obviously have a  negative impact on future short-term chargeback ratios

because of the lower transaction volume against trailing chargebacks), or significantly increase the volume of its international transactions in order to lower the future short-term chargeback ratios.

39.     Because Website Billing had essentially eliminated the truly fraudulent international transactions (as opposed to transactions involving "friendly fraud," which Website Billing was hoping Visa would detect),[5] Website Billing ultimately chose to pursue its second option and attempt to increase its international business.

40.     To further bolster its fraud prevention efforts, Website Billing retained an outside firm – Shared Global Systems ("Shared Global") – which had been endorsed by Visa and which specialized in identifying fraudulent or high risk transactions.  Shared Global would screen all of Website Billing's transactions, and when Shared Global would flag a transaction as being "high risk," Website Billing would decline the sale.

41.     Shared Global represented to Website Billing that by using its system, Website Billing's chargebacks would not exceed 1% of its transactions.

42.     Despite the considerable expense to Website Billing of adding this layer of fraud protection, Website Billing placed itself on the cutting edge of fraud prevention not only for its own benefit, but for the benefit of Visa and its members.

43.     By mid-April 2001, all of Website Billing's international credit card transactions were being "fraud screened" by Shared Global.  By May 2001, all of Website Billing's transactions were being "fraud screened" by Shared Global.

---

[5]  Mastercard recently reported 2.6% of all on-line transactions result in chargebacks.  Of those chargebacks, 80-83% result from the consumer saying "I didn't do it."  Visa acknowledges that such chargebacks represent approximately 70-75% of internet disputes.

<u>Website Billing is Advised of Fine for January 2001</u>

44.    In the meantime, and again, despite Website Billing's herculean efforts to combat fraud, on March 6, 2001, Visa advised Website Billing that its international chargeback ratio for January 2000 was excessive.[6]    Accordingly, Visa imposed further penalties against Website Billing in the amount of $20,800 (corresponding to 208 international chargebacks against 2877 total international transactions) by directly or indirectly debiting Website Billing's bank account.

<u>Website Billing's Frustration with Tracking Chargebacks</u>

45.    As Website Billing continued to crack down on fraudulent transactions, Website Billing was expecting to be able to measure its success by relying on Visa to advise it on a timely basis of the number of chargebacks being processed.

46.    To Website Billing's frustration, however, Visa was not able to advise Website Billing of  chargebacks until at least two to three months after the chargebacks were being initiated.  For example, when Visa advised Website Billing on March 8, 2001 that its chargeback ratio for January 2001 was excessive, Website Billing had not even been advised of a majority of the January chargebacks.

47.    Because of Visa's notification delay, and because Website Billing's charges are typically recurring charges, customers were being billed on a monthly basis for sometimes two additional months after the customer initiated its first chargeback request, thus compounding the chargeback ratio problem further.

---

[6] As noted above, Visa arbitrarily lowered its acceptable chargeback ratio for Website Billing's international transactions from 5% to 2 ½ % effective January 1, 2001, although it remained at 5% for most other industries.

48.    Recognizing the difficulties this reporting delay was causing, Website Billing ultimately made arrangements to have chargeback notifications sent directly from Equifax (the Visa/Ocean Bank processor). Although this measure resulted in a cost to Website Billing of over $50 per day, it cut the delay time by more than 50%. Notwithstanding this continuing effort, Visa remained indifferent to Website Billing's demand for the creation of standards in the processing of on-line transactions to protect merchants, and these delays, only exacerbated the pattern.

<u>Visa Introduces Fines Under New "Overall" Program</u>

49.    In May 2001, after Website Billing seemingly resolved its international chargeback problems at a significant expense, Visa notified Website Billing that it was now going to be subject to penalties under a "new" chargeback program (the "Overall Chargeback Monitoring Program"), under which Visa planned to impose a $100 fine for every chargeback when the ratio of total chargebacks (international and domestic combined) to total transactions exceeded 2 ½ %. By fax received May 11, 2001, Visa advised Website Billing that its overall chargeback ratio for April 2001 was 3.56%, and accordingly penalties in the amount of $151,500.00 would be deducted from Website Billing's account.

50.    Website Billing was shocked to receive this notice for a variety of reasons. First, having never been provided with a copy of the Visa Rules and Regulations, Website Billing had no knowledge of Visa's Overall Chargeback Monitoring Program. Second, because this program, if enforced, would result in penalties on <u>all</u> chargebacks, including disputed chargebacks, reversed chargebacks, chargebacks from CVV2 authenticated transactions, AVS authenticated transactions,[7]

---

[7] AVS is a Visa address verification service commonly used by Visa merchants to verify a customer's credit card particularly in a "card-not-present" transaction. Website Billing began using AVS for all transactions in approximately February 2001.

and chargebacks falling within the acceptable threshold, the amount of the penalty would be devastating. Finally, because Website Billing's fraud protection measures had essentially eliminated most traditional fraud, the current chargebacks were resulting almost exclusively from "friendly fraud."

Visa Agrees to a Telephone Conference

51.    Apparently recognizing that "friendly fraud" was plaguing not only Website Billing, but the entire on-line industry, in mid-May 2001, Visa finally agreed to hold a telephone conference with Website Billing to discuss these issues. During that telephone conference, Visa basically explained the Overall Chargeback Monitoring Program to Website Billing and Website Billing explained how it has adopted and developed a host of new procedures to combat fraud. Because of the seriousness of the problem on an industry-wide basis, the parties agreed to hold monthly telephone conferences to evaluate the progress of Website Billing's efforts and to address other developments occurring within the industry.[8]

52.    As a result of Website Billing's continued efforts to avoid even medium risk transactions, Website Billing began declining a significant number of even potentially valid business transactions, resulting in a drastic decrease in the number of overall transactions being processed and thus Website Billing's total revenues.

Website Billing Proposes to Discontinue Accepting International Transactions
After Being Advised of Excess International Chargebacks for May 2001

53.    In July 2001, Visa notified Website Billing that its international chargebacks for May 2001 once again exceeded acceptable levels. As a result, Visa imposed fines totaling $192,000.00

---

[8] Despite this agreement, Visa refused to participate in telephone conferences over the next three months.

based upon 1,920 chargebacks against 26,122 total international transactions. (Website Billing apparently did not exceed acceptable levels under the Overall Chargebacks Monitoring Program.)

54.    In response to this notice, and even though Website Billing knew that the subject chargebacks included disputed chargebacks, reversed chargebacks, chargebacks on CVV2 authenticated transactions, chargebacks on AVS authenticated transactions, and chargebacks falling within the acceptable threshold, Website Billing nevertheless advised Visa that it was prepared to discontinue accepting any international transactions (which accounted for approximately 25% of Website Billing's business).  Inasmuch as Visa was now imposing fines under two different chargeback programs, Website Billing requested confirmation that it would avoid future penalties if it took such drastic action, particularly since the number of total transactions was expected to decline rapidly, resulting in Website Billing's chargeback ratios appearing inflated for a period of at least a few months under both the International Chargeback Monitoring Program and the Overall Chargeback Monitoring Program.

55.    In mid-July, Visa (through Ocean Bank) advised Website Billing that it would not be penalized if it discontinued accepting international transactions as proposed.

<u>Website Billing is Advised of Excess International Chargebacks for June 2001</u>

56.    Notwithstanding Website Billing's sacrifice of its international business, resulting in a loss of revenue of roughly $1 million per month, and notwithstanding Visa's commitment to withhold penalties for chargebacks involving international transactions, on or about July 31, 2001, Visa advised Website Billing that its international chargeback ratio for June exceeded 2 1/2% and accordingly it was going to impose additional fines totaling $186,000.00.

57.   Despite Website Billing's protests, on August 31, 2001, Visa imposed penalties against Website Billing in the amount of $186,000.00 by debiting its bank account (corresponding to 1,860 chargebacks, including disputed chargebacks, reversed chargebacks, chargebacks on CVV2 authenticated transactions, chargebacks on AVS authenticated transactions, and chargebacks falling within Visa's acceptable threshold).

The Parties Participate in a September Conference Call

58.   In frustration over the continued fines being levied against it, and over the continued absence of standards for card authorization and user authentication to protect on-line merchants in connection with the "I didn't do it" type of customer disputes (such as those that exist for box retailers), Website Billing insisted on another meeting with Visa.  Visa would again only agree to a telephone conference.

59.   Accordingly, on September 5, 2001, the parties participated in a conference call and discussed, *inter alia*, the implementation of standards for user authentication.  Visa acknowledged that in all likelihood, the implementation of such standards would eliminate chargeback problems as they exist today.

60.   The parties also discussed the monitoring programs in general as well as the drastic decline in business attributable to Website Billing's fraud screening program, which in all likelihood, was also screening out a significant number of otherwise valid transactions.

61.   Website Billing requested that Visa reverse its previously imposed fines due to (A) the lack of standards, user authentication and otherwise, (B)  Website Billing's good faith efforts to eliminate fraudulent transactions, and (C) the draconian nature of the fines themselves.

62.   Following this conference call, Website Billing was led to believe that Visa would consider waiving at least the June fine.  Website Billing was also fairly confident that all of its chargeback issues were now under control, particularly since it was no longer accepting international sales and since its domestic chargebacks had never exceeded acceptable levels.

<u>Visa Proposes to Impose New Fines for Excessive CDCs</u>

63.   Notwithstanding the apparent resolution of its chargeback issues, on September 13, 2001, Visa advised Website Billing that it was now going to be subject to a different type of fine under the Overall Chargeback Monitoring Program, this time because Website Billing's CDC ratio purportedly exceeded the allowable 1% threshold.  A CDC chargeback – a purportedly unauthorized transaction –  is essentially one in which the customer claims "I didn't do it."

64.   Prior to its receipt of this notice, Website Billing never had a CDC problem, and its only prior experience with a problem under the Overall Chargeback Monitoring Program, occurred five months earlier as a result of an isolated incident due to a substantial short-term increase in international transactions.

65.   In response, Website Billing advised Visa that Website Billing actually had a legitimate dispute with most of the CDC chargebacks under Visa's own regulations.  Accordingly, many of the chargebacks had already been successfully reversed.  In other words, even though customers may have claimed "I didn't do it," Website Billing had sufficient proof that the charge was in fact authorized, thereby resulting in a reversal by Visa itself (or by a Visa member).

66.   Website Billing also noted that the August CDCs included international chargebacks, which Visa had previously agreed would not be held against Website Billing.

67.    Incredibly, Visa's response to Website Billing was that even though the charges may ultimately be verified and reversed, Website Billing would nevertheless be subject to fines.

68.    As a result of this arbitrary decision, Website Billing has now been fined an additional $330,000.00, which may force Website Billing out of business.

### Visa's Calculation of Chargeback Ratios

69.    As noted above, Visa calculates the chargeback ratios by comparing the number of chargebacks processed in a given month against the total number of transactions processed by the merchant in the same month, even though the chargebacks may apply to (and in all likelihood would have applied to) transactions occurring in previous months.  Thus, when a merchant experiences a decrease in sales, chargebacks from transactions occurring in previous months inflate a merchant's chargeback ratio.

70.    When comparing the total number of chargebacks to the total transactions occurring in the same month, Website Billing would not have been subject to any fines in 2000, even if Website Billing assumes, for the sake of argument, that each chargeback was in fact a legitimate chargeback. Despite this, Visa (by itself, or through its members) imposed fines against Website Billing in 2000 totaling over $126,000.00.

71.    As also noted above, Visa's chargeback ratio does not exclude disputed chargebacks, reversed chargebacks, chargebacks on CVV2 authenticated transactions, chargebacks from AVS authenticated transactions, or chargebacks falling within the acceptable threshold.  Had these types of chargebacks been excluded from Visa's calculations, Website Billing would have never exceeded acceptable levels in 2001 and thereby would have avoided the imposition of fines totaling over $1,000,000.00.

72.    Additionally, and as noted above, effective January 1, 2001, Visa lowered the international chargeback ratio from 5% to 2 ½% for merchants engaged in certain industries, such as telemarketing and gambling. To date, Visa has never explained why Website Billing is considered by Visa to be an "inbound telemarketer," and thereby subject to Visa's lower chargeback threshold and higher rates.

Unauthorized Double Charges

73.    As noted above, Website Billing's chargeback ratio has also been negatively affected by excessive unauthorized chargebacks made by Visa's issuing banks. This occurs when a customer charges a Website Billing transaction to its credit card and then advises Website Billing that it wishes to dispute the transaction. In that event, Website Billing immediately issues a credit to the customer's card, sends an e-mail confirmation of the credit to the customer, and notifies the Visa issuing bank that the charge has been reversed. Notwithstanding the issuance of the credit, Website Billing experiences hundreds of instances each month of chargebacks where a credit has already been issued to the customer, resulting in an inflation of the chargeback ratio.

The Cost to Website Billing of a Chargeback

74.    Although Visa's chargeback fine is $100, the cost of a chargeback to Website Billing is usually more than 50% higher. Specifically, in many instances, Website Billing has already issued a refund to the customer by the time a chargeback is processed. Thus, when Website Billing credits the customer's account for the amount of the sale, and when the bank issues a chargeback, there is an additional debit to Website Billing's account in the same amount. For example, on an original sale of $39.99, Website Billing receives $38.31 (after deducting the credit card discount rate). If the customer disputes the transaction directly with Website Billing, Website Billing automatically

credits the customer's card, resulting in a debit to Website Billing's account for the full amount of sale – $39.99.  When a chargeback is then issued against the same sale, Website Billing's account is again debited for the amount of the original sale  – $39.99.  In effect, therefore, Website Billing is paying the discount rate twice and the customer is getting a second credit on the original sale amount.  Also, Website Billing pays a $15.00 chargeback fee to its acquiring bank.  Thus, the total loss to Website Billing from a chargeback occurring on an average sale of $39.99 is $156.67 calculated as follows:

| | |
|---|---|
| Revenue on $39.99 Sale to Website Billing: | $ 38.31 |
| Credit Issued at Customer's Request: | -$ 39.99 |
| Chargeback from Card Issuing Bank: | -$ 39.99 |
| Acquiring Bank Chargeback Fee: | -$ 15.00 |
| Visa Penalty: | -$100.00 |
| Total Loss: | -$156.67 |

### Visa's Acknowledgement of the Problem and its Belated Response

75.    Visa recently announced that it intends to introduce a new system for identifying on-line consumers and reducing on-line fraud.  Unlike the current model, which shifts the entire burden of loss to the merchant in a card-not-present environment, Visa's new system will supposedly guaranty payment to merchants when a transaction is properly authenticated under the program.

76.    This program has apparently been in development for approximately one year, yet Visa never discussed it with Website Billing despite Website Billing's demand for this type of protection, and despite the fact that Visa plans on signing up 50 on-line retailers as part of its launch of the program within the next three months.

77.    Thus, it is apparent that Visa is finally taking responsibility for fulfilling its obligation to on-line merchants and shifting the burden of fraudulent transactions back to the consumers who

commit the fraud. Had Visa taken these measures just one year ago, Website Billing would have no doubt avoided every fine which has been imposed, and potentially would have saved the millions of dollars in sales which Website Billing sacrificed at Visa's behest.

Attorney's Fees; Conditions Precedent

78.    Website Billing has retained the undersigned attorneys to represent it in this action and is obligated to pay them a reasonable fee for their services.

79.    All conditions precedent to the institution of this action have been waived, performed, or have occurred.

Count I - Declaratory Relief

80.    This is an action seeking a declaration of Website Billing's rights under Florida law and under the Visa Rules and Regulations pursuant to 28 U.S.C. § 2201.

81.    Website Billing repeats and realleges the allegations set forth in paragraphs 1 through 79 above as if fully set forth herein.

82.    There is presently a real and justiciable controversy between the parties concerning a variety of issues.

83.    First, despite the fact that the parties' relationship is governed by the Visa Rules and Regulations, and despite Website Billing's repeated demands to be provided with a copy of such rules and regulations, Visa refuses to publicize such rules and regulations. Accordingly, Website Billing is unsure of its rights in general under the Visa Rules and Regulations and whether such rules and regulations are even binding on Website Billing.

84.    Second, Website Billing claims that Visa's calculation of chargeback ratios improperly compares chargebacks processed in a given month against transactions processed during the same

month even though the chargebacks relate to transactions occurring in a different month. Thus, Visa's calculation of its chargeback ratio does not reflect an accurate percentage of chargebacks to total transactions. As a result of Visa's miscalculations, Website Billing was subject to penalties totaling in excess of $126,000.00 in 2000, which amount was directly debited from Website Billing's bank account.

85.     Third, effective January 1, 2001, Visa arbitrarily lowered the international chargeback ratio for Website Billing from 5% to 2 1/2% even though Website Billing apparently does not fall within the category of merchants subject to the reduced ratio. This reduced ratio and the accompanying higher discount rate should not apply to Website Billing.

86.     Fourth, Visa has imposed its $100 fine on every Website Billing chargeback – not simply those chargebacks which exceed the acceptable threshold. As a result of imposing its fine on "acceptable" chargebacks, Website Billing has been exposed to significant losses and the further arbitrary application of Visa's Rules and Regulations. Under such rules and regulations, penalties, if imposed at all, should only be applied to chargebacks that exceed the acceptable threshold.

87.     Fifth, under Florida law, liquidated damages are only permissible where it is intended to compensate a party for the other party's failure to perform. Liquidated damages which operate as a penalty are unenforceable.

88.     Here, Visa's $100 chargeback fine should clearly constitute an unenforceable penalty under Florida law. Among other things, the penalty is imposed without regard to the amount of the transaction at issue, whether the transaction is ultimately validated, and most importantly, it is only imposed when the chargeback ratio exceeds a certain threshold.

89.     Thus, by not imposing a fine on chargebacks falling below the threshold unless and until the threshold is met, Visa's chargeback fine constitutes a clear and undeniable penalty which is unenforceable under Florida law.  Despite this, Visa continues to levy its unlawful fines.

90.     For all of the reasons set forth above, Website Billing is unsure of its rights under Florida law, under the Visa Rules and Regulations, and under the subject Merchant Agreement. Accordingly, declaratory relief under 28 U.S.C. §2201 is warranted.

WHEREFORE, Website Billing respectfully requests that the Court enter a judgment against Visa U.S.A. and Visa International declaring the following:

A.      That as a result of Visa's failure to provide Website Billing with a copy of the Visa Rules and Regulations, Visa's imposition of any penalties and fines thereunder is unwarranted and must be reversed;

B.      That Visa's chargeback ratio calculation improperly compares the number of chargebacks against total sales occurring in different time periods and that all fines imposed as a result of such improper comparison be reversed;

C.      That Visa's chargeback ratio calculation improperly considers chargebacks on transactions which are later verified, and that all such verified transactions be excluded from the calculation of excess chargebacks;

D.      That Visa's chargeback ratio improperly considers chargebacks occurring after Website Billing has specifically notified the card issuer that the customer's transaction has been cancelled and a credit has been issued to the customer's account;

E.   That Visa's chargeback fines constitute unlawful liquidated damage penalties under Florida law;

F.   That Visa be required to refund (or cause to be refunded) any and all unlawful charges, fines and penalties imposed against Website Billing; and

G.   That Website Billing be awarded its attorney's fees and costs incurred in bringing this action.

### Count II - Breach of Implied Covenant of Good Faith and Fair Dealing

91.   This is an action for damages under the common law of Florida for breach of the implied covenant of good faith and fair dealing.

92.   Website Billing repeats and realleges the allegations set forth in paragraphs 1 through 79 above as if fully set forth herein.

93.   Florida contract law imposes a covenant of good faith and fair dealing in every contract.

94.   As a third party beneficiary under the contract between Visa and Ocean Bank, or alternatively, as a principal of Ocean Bank and implied party under the subject Merchant Agreement, Visa USA and Visa International have an obligation under Florida law to fulfill their obligations under the Merchant Agreement and the Visa Rules and Regulations fairly and in good faith.

95.   As more particularly described above, Visa USA and Visa International have breached their obligation of good faith and fair dealing in a variety of ways.

96.   First, Visa violated its obligation of good faith and fair dealing by miscalculating Website Billing's chargeback ratios, and by including disputed chargebacks, reversed chargebacks, chargebacks on CVV2 and AVS authenticated transactions, in the calculation of excess chargebacks.

97.    Second, in agreeing to accept valid charges under the Merchant Agreement, Visa had an obligation to take precautions to avoid consumer fraud in on-line transactions (much as it has done in the brick and mortar world).

98.    Despite that obligation, Visa is only now beginning to introduce measures which would shift the burden of proving the validity of a transaction to the consumer and away from the merchant.

99.    The obligation of good faith and fair dealing imposes an obligation upon Visa to develop standards and procedures for authenticating and validating on-line transactions, which obligation Visa has failed to fulfill.

100.   As a result of Visa's breach of its obligations of good faith and fair dealing Website Billing has suffered damages in excess of $1 million.

WHEREFORE, Website Billing respectfully requests that the Court enter judgment against Visa USA and Visa International for damages in excess of $1 million, interest, attorney's fees, costs, and such other and further relief deemed proper.

## Count III - Civil Conspiracy

101.   This is an action for damages against Visa USA and Visa International for civil conspiracy.

102.   Website Billing repeats and realleges the allegations set forth in paragraphs 1 through 79 above as if fully set forth herein.

103.   Upon information and belief, Visa compensates $70.00 of every $100 chargeback fine to the Visa issuing bank which initiates the chargeback on behalf of the consumer. Thus, Visa gives an incentive to its issuing banks to initiate chargebacks even where no chargeback may be appropriate or warranted.

104. Upon information and belief, Visa (which is controlled by the issuing banks) has conspired with such issuing banks to create and/or process chargebacks to merchants such as Website Billing in order to levy significant fines even where no chargeback is justified or warranted.

105. As a result and proximate cause of this conspiracy, Website Billing has suffered and continues to suffer extensive and potentially irreparable damage and harm.

WHEREFORE, Website Billing respectfully requests that this Court enter judgment against Visa USA and Visa International for damages in excess of $1 million, interest, attorneys' fees, costs, and such other and further relief deemed proper.

Count IV - Civil Theft

106. This is an action for damages under Florida's civil theft statute, §772.11, Fla. Stat.

107. Website Billing repeats and realleges the allegations set forth in paragraphs 1 through 79 above as if fully set forth herein.

108. By unlawfully debiting Website Billing's bank account (or causing such account to be debited) for in excess of $1,000,630.00, Visa has knowingly obtained Website Billing's property with intent to, either temporarily or permanently, deprive Website Billing of its right to such funds. Alternatively, by debiting Website Billing's accounts through the imposition of penalties under the Visa Rules and Regulations, Visa has appropriated Website Billing's property for its own use or for the use of its members who are similarly not entitled to such funds.

109. Visa's actions in so debiting, or causing to be debited, Website Billing's account constitutes theft under §812.014, Fla. Stat., and accordingly civil theft under §772.11, Fla. Stat.

WHEREFORE, Website Billing respectfully requests that this Court enter judgment against Visa USA and Visa International ordering said Defendants to divest themselves and their members

of all fines and penalties imposed against Website Billing under the Visa Rules and Regulations, treble damages, interest, attorneys' fees, costs, and such other and further relief deemed proper.

### Count V - Unfair Deceptive Trade Practices

110. This is an action for damages and injunctive relief under the Florida Deceptive and Unfair Trade Practices Act, §501.201, et seq., Fla. Stat.

111. Website Billing repeats and realleges the allegations set forth in paragraphs 1 through 79 above as if fully set forth herein.

112. Visa's imposition of penalties and fines under the Visa Rules and Regulations as described above constitutes unconscionable acts and practices and unfair or deceptive acts and practices under the Florida Deceptive and Unfair Trade Practices Act.

113. As a result of Visa's unlawful acts and practices, Website Billing has suffered and stands to suffer substantial damages totaling in excess of $1 million.

WHEREFORE, Website Billing respectfully requests that this Court enter judgment against Visa USA and Visa International under §501.211, Fla. Stat., declaring Visa's conduct unlawful, enjoining further violation of the Florida Deceptive and Unfair Trade Practices Act, and awarding such other and further relief deemed proper, including damages, costs, and attorneys' fees under §501.2105, Fla. Stat.

### Count VI- Injunctive Relief

114. This is an action seeking injunctive relief against Visa USA and Visa International pursuant to Fed. R. Civ. P. 65.

115. Website Billing repeats and realleges the allegations set forth in paragraphs 1 through 79 above as if fully set forth herein.

116.  As more fully and particularly set forth above, Visa has imposed (and threatens to impose) substantial fines and penalties against Website Billing under the Visa Rules and Regulations.

117.  Additionally, Website Billing is concerned that Visa's actions will now result in a termination of Website Billing's Merchant Agreement, which will in turn effectively put Website Billing out of business.

118.  Visa's actions have resulted in, and are continuing to cause Website Billing irreparable harm, which can only be avoided through the issuance of appropriate injunctive relief.

WHEREFORE, Website Billing respectfully requests that the Court enter an injunction, requiring that Visa refrain from imposing additional unlawful fines and penalties against Website Billing under the Visa Rules and Regulations, refrain from terminating or causing the termination of Website Billing's Merchant Agreement, and granting such other and further relief deemed just and proper.

KLUGER, PERETZ, KAPLAN & BERLIN, P.A.
Attorneys for Plaintiff
Miami Center, Seventeenth Floor
201 So. Biscayne Blvd.
Miami, Florida 33131
Telephone: (305) 379-9000
Facsimile: (305) 379-3428

By: _Abbey L. Kaplan_  10/4/2001
        Abbey L. Kaplan
        Florida Bar No. 200255
        Michael B. Chesal
        Florida Bar No. 775398





RECYCLED PAPER





**OCEAN BANK**

# MERCHANT PROCESSING AGREEMENT

## MERCHANT APPLICATION

LEGAL NAME: **WEBSITE BILLING.COM INC**       ADDRESS: _____

STORE NAME/DBA: **WEBSITE BILLING.COM**   LOCATION ADDRESS: **5555 HOLLYWOOD BLVD #203 HOLLYWOOD**
<br>Street                                                                (City, State, Zip) **FL, 33021**

CONTACT NAME: **RICHARD KWIAT**       TITLE: **PRESIDENT**       Street                       (City, State, Zip)

CONTACT: Phone **(954)987-5677** Fax # **(954)987-5675**  State Tax ID # _____ Fed. Tax ID # **65-0768139**

OWNERSHIP TYPE: ☐ Sole Proprietor  ☐ Partnership  ☒ Corporation  ☐ Multiple Locations  ☐ Non-Profit  ☐ Other ____

MERCHANDISE/SERVICE SOLD: **E-COMMERCE**       Telephone **100** % Mail Order _____ % Retail _____ %

**OWNERS/OFFICERS:**

| Name | Title | D/O/B | SS# |
|---|---|---|---|
| **RICHARD KWIAT** | **PRESIDENT** | **8/22/66** | **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** |
| **2306 SW 183ᵗʰ TERR** Home Address | | **MIRAMAR, FL. 33029** City, State, Zip | |
| **BENIGNO GARCIA** | **V.P** | **11/27/66** | **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** |
| **1632 CLEVELAND ST** Home Address | Title | **HOLLYWOOD, FL. 33020** City, State, Zip | |
| Name | Title | D/O/B | SS# |
| Home Address | | City, State, Zip | |

**COMPANY HISTORY:**

Date Business Started **FEB,12, 1997** _____ Length of Current Ownership **2 YEARS**

Previous Owner _____ Previous Business Name: _____

Current/Previous Bank Card Processor _____ City _____ State _____

Merchant # _____ Termination Reason _____

Seasonal  Y _____ N _____ High Volume Months _____ Prior Bankruptcies _____ Y ____ N ____

BANK REFERENCE: **OCEAN BANK**       Address: _____

Contact **GEORGE ALVAREZ** _____ Phone No. **569-5425** _____ Acct. No. _____

TRADE REFERENCE: _____   Address: _____

Contact _____     Phone No. _____ Acct. No. _____

### ELECTRONIC DEBIT/CREDIT AUTHORIZATION

Merchant hereby authorizes Bank, in accordance with this Agreement, to initiate debit/credit entries to Merchant's deposit account, as indicated below. This authority is to remain in full force and effect until (a) Bank has received written notification from Merchant of its termination, in such a manner as to afford Bank reasonable opportunity to act on it and (b) all obligations of Merchant to Bank that have arisen under this Agreement have been paid in full. This authorization extends, but is not limited, to such entries to this account which concern discount fees, transaction fees, chargebacks, penalties, service fees, return item fees, lease, rental and purchase charges involving Point-Of-Sale ("POS") and credit card imprint equipment.

**A Voided check from this account *must* be attached.**

| Bank Name **OCEAN BANK** | | Branch | |
|---|---|---|---|
| City | | State | Zip |
| Transit Number  **0 6 6 0 1 1 3 9 2** | | DDA Number **0 1 2 1 3 4 7 4 0 5** | |

By signing this Agreement you verify that all of the information contained on the attached application is true, complete, and correct to the best of your knowledge. The undersigned further authorizes Bank to verify the information supplied on the attached application and to receive and verify credit information about the signer both now and in the future.

Merchant    By [ _____ ]   Title [ _____ ]   Date [ _____ ]

## PRICING SCHEDULE A

DEPOSIT TYPE:    ☐ PAPER   ☐ ECR   ☐ PC   ☐ EDC   ☐ ARC  **XX** Other (explain) **IC VERIFY**

| | | | | |
|---|---|---|---|---|
| *Qualified — Discount Fee | Visa **3.10** % | MasterCard **3.10** % | Debit Cards _____ | |
| *Mid-Qualified Fee | Visa **3.10** % | MasterCard **3.10** % | T&E **.20** | |
| *Non-Qualified Discount | Visa **4.10** % | MasterCard **4.10** % | Voice Authorization **.95** | |

Discount Fee based upon annual Visa volume $ _____ Average Ticket $ _____

Discount Fee based upon annual MC volume $ _____ Average Ticket $ **30.00**

Chargeback Fee $ **15.00** Statement Fee $ **10.00** Item Fee $ **.15** Application Fee $ **75.00** Other $ _____

Imprinter Fee $ _____ Quantity _____ Plate Quantity _____

*Minimum Fee: A minimum discount fee of $ **20.00** per month will be charged. If monthly sales do not generate at least $ **20.00** in discount fees, an amount equal to the difference between the actual discount fee and $ **20.00** will be assessed.

Reserve requirement: **60% OF 1 MONTH SALES TO BE DEBITED @ 10% PER MONTH UNTIL REACHED**

## ACCEPTANCE

Merchant warrants that the information contained in this Application and Agreement is true, correct and complete. Merchant understands that this Agreement shall not take effect until Merchant has been approved by Bank and a Merchant Identification Number is issued to Merchant. Merchant understands that credit cards, whose acceptance is covered under the terms of this Agreement, will not be honored by Merchant until such time as Merchant is issued such number by Bank. Merchant understands that any transactions involving such credit cards, honored prior to the issuance of Merchant's Identification Number will NOT be deposited with or accepted by Bank.

**"EXHIBIT A"**

The undersigned authorizes Bank to obtain credit and reference information, as it may require and deem appropriate, concern-

*Minimum Fee: A minimum discount fee of $ __20.00__ per month will be charged. If monthly sales do not generate at least
$ __20.00__ in discount fees, an amount equal to the difference between the actual discount fee and $ __20.00__ will be assessed.
Reserve requirement: **60% OF 1 MONTH SALES TO BE DEBITED @ 10% PER MONTH UNTIL REACHED**

## ACCEPTANCE

Merchant warrants that the information contained in this Application and Agreement is true, correct and complete. Merchant understands that this Agreement shall not take effect until Merchant has been approved by Bank and a Merchant Identification Number is issued to Merchant. Merchant understands that credit cards, whose acceptance is covered under the terms of this Agreement, will not be honored by Merchant until such time as Merchant is issued such number by Bank. Merchant understands that any transactions involving such credit cards, honored prior to the issuance of Merchant's Identification Number, will NOT be deposited with or accepted by Bank.

The undersigned authorizes Bank to obtain credit and reference information, as it may require and deem appropriate, concerning the statements made within this Application, as they may relate to this Application, and agrees that this Application shall remain Bank's property, whether approved or not. The undersigned hereby certifies that all statements made herein are true, correct and complete.

Agreed and accepted on __11/17__, 19 __99__

**MERCHANT**

By (Individual #1) x _(signature)_

Printed Name _Richard Kuiat_

Title _President_

By (Individual #2) x _(signature)_

Printed Name _Benigno Garcia_

Title _VP / SEC_

| BANK USE ONLY |
|---|
| **OCEAN BANK** |
| By x _(signature)_ |
| Printed Name **GLENN H BLOCK** |
| Title **S.V.P** |
| By x |
| Printed Name |
| Title |

## PERSONAL GUARANTY

The undersigned unconditionally guarantees to Bank the performance of this Agreement by Merchant, including payment of all sums due and owing and any attorneys fees and costs associated with enforcement of the terms thereof. Bank shall not be required to first proceed against Merchant or enforce any other remedy before proceeding against the undersigned. This is a continuing guaranty and shall not be discharged or affected by the death of the undersigned, shall bind the heirs, administrators, representatives and assigns and may be enforced by or for the benefit of any successor of Bank. The term of this guaranty shall be for the duration of the Merchant Processing Agreement and shall guarantee all obligations, in a certain amount not to exceed twelve (12) times the monthly BankCard volume, which may arise or accrue during the term though enforcement shall be sought subsequent to any termination.

_____  _____  _____  _____
Witness                          Date                    Personal Guarantor              Date

MC5-02-OB342

# MERCHANT PROCESSING AGREEMENT

This Agreement ("Agreement") entered into by and between Ocean Bank with its principal offices located in Miami, Florida ("Bank") and the merchant which signed the Merchant Application ("Merchant").

WHEREAS, Bank is engaged in the general banking business including the purchase of Credit Card Transactions from merchants; and

WHEREAS, Merchant desires to honor as its business location(s) Cards presented in connection with the retail sale of Products or services to customer.

NOW THEREFORE, the parties hereto do agree as follows:

1. **Definitions:** Except as otherwise required by the context, the following terms shall have following meanings:
   1.1 "ACH" means the Automated Clearing House paperless entry system controlled by the Federal Reserve.
   1.2 "Account" means a commercial checking account maintained by Merchant as set forth in Section 2.10 for the crediting of collected funds and the debiting of fees and charges pursuant to the terms of this Agreement
   1.3 "Authorizations" means a computerized function or a direct phone call to a designated number to examine individual transactions to obtain credit approval from the Card Issuer.
   1.4 "Card" means (i) a valid credit card in the form issued under license from Visa U.S.A., Inc., Visa International, Inc. or MasterCard International, Inc. ("Bank Card") or (ii) any other valid credit card approved by Merchant pursuant to an agreement with Bank.
   1.5 "Cardholder" means the person whose name is embossed upon the face of the Card.
   1.6 "Card Association" means Visa U.S.A., Inc., Visa International, Inc., MasterCard International, Inc. or any other Card Issuers that provide Cards that are accepted by Merchant pursuant to an agreement with the Bank.
   1.7 "Card Issuer" means the financial institution or company which has provided a Card to the Cardholder.
   1.8 "Chargeback" means the procedure by which a Sales Draft (or disputed portion thereof) is returned to bank by a Card Issuer because such item does not comply with the applicable Card plan's operating regulations.
   1.9 "Credit Voucher" means a document executed by a Merchant evidencing any refund or price adjustment relating to Products to be credited to a cardholder account.
   1.10 "Forced Transaction" means any Transaction for which required data is not electronically captured by reading Card's magnetic stripe
   1.11 "Imprint" means (i) an impression on a Sales Draft manually obtained from a Card through the use of an imprinter or (ii) the electronic equivalent obtained by swiping a Card through a terminal and electronically printing a Sales Draft.
   1.12 "Merchant Agreement" means this Agreement, the Merchant Application, Pricing Schedule and Equipment Schedule B
   1.13 "Products" means all such goods and services, other items of tangible personal property and service contracts, as are sold or rendered by Merchant.
   1.14 **NON-QUALIFYING TRANSACTIONS**
   The reduced discount rate assessed to Merchant is directly based on and computed in conjunction with a Zero (0) Floor Limit, Magnetic Stripe Reading and Electronic Authorization and Transaction processing. Maintaining this reduced rate requires strict and continuing adherence to the above procedures, policies and requirements. Deviations or omissions from these procedures will result in interchange differential charges being assessed to Merchant's Commercial Account on:
      1. Those transactions that are not in strict accordance with the above;
      2. Those transactions involving International Cardholders (these cards issued outside of the U.S.A.). These differential charges will be based directly on the variances in the MasterCard and Visa Credit Card Interchange rates, as they are assessed to Bank. In the event that Merchant's non-qualifying transaction level becomes excessive, an overall re-evaluation and discount rate adjustment will be necessary, retroactive to the beginning of the non-qualifying period.
   1.15 "Transaction" means any retail sale of Products, or credit for such, from a Merchant for which the customer makes payment through the use of any Card and which is presented to Bank for settlement. Where the context so requires, the term "Transaction" shall be deemed to include any Sales Drafts and/or Credit Vouchers issued in connection with the Sale of Products for which a card is used as the means of payment.
   1.16 "Voice Authorization" means a direct phone call to a designated number to obtain credit approval on a Transaction from the Card Issuer.
   1.17 "Code 10 Authorization" the transaction involves suspicious or unusual circumstances

2. **Rights, Duties and Responsibilities of Merchant**
   2.1 Merchant shall honor all Cards provided that:
      (a) the Card is valid and is presented to Merchant at the time of the sale by the Cardholder or an authorized user of the Card account. A Card is valid only if it is presented on or after the valid date, if any, and before the expiration date shown on its face;
      (b) the Card is used as payment for Products which are sold or rendered by Merchant under the terms of this Agreement;
      (c) Merchant has followed procedures as established by Bank for complete of Sales Drafts;
      (d) Merchant shall honor all valid Visa and MasterCard cards;
      (e) Merchant shall not establish minimum or maximum transaction amounts.
   2.2 Merchant agrees to complete Sales Drafts in conformity with the terms of this Agreement and the Card Association's rules and regulations, including but not limited to:
      (a) for Transactions that are not mail or phone orders, Merchant shall secure a legible imprint of the card including the name of the Cardholder, the Cardholder account number and the Card's expiration date or legible print of the information by electronic printer attached to Merchant's terminal;
      (b) if Merchant is authorized to accept mail or phone sales draft order transactions, Merchant shall record the name of the Cardholder, the Cardholder account number and the expiration date;
      (c) Merchant shall obtain a signature on the sales draft and compare the signature on the Card and the back of the Card to verify that they match. If the Card is unsigned, the Merchant shall obtain an authorization regardless of Merchant's floor limit and shall obtain additional identification from the Cardholder, and require the cardholder to sign the Card.
      (d) in the case of mail or phone order and provided Merchant has been duly authorized by Bank to accept mail or phone orders, the letters MO or PO, as the case may be, shall be clearly indicated on the Sales Draft;
      (e) the date of sale;
      (f) an accurate description of the Products sold or rendered;
      (g) the total cash price of the sale or the words "deposit" or "balance" if full payment is to be made in this manner at different times on different sales drafts; and
      (h) the city and state wherein such Transaction occurred.
      (i) Merchant may not use two or more Sales Drafts for a single transaction for any reason whatsoever.
      (j) the Merchant shall compute the first four digits of the embossed card number to the four digits printed above the account number on a Visa card. If the numbers are not the same, the Merchant must place a Code 10 voice authorization call.
      (l) Merchant shall deliver a completed copy of the Sales Draft to the Cardholder.
   2.3 Merchant's policy for the exchange or return of goods sold and adjustment for services rendered shall be established and posted in accordance with operating regulations of the applicable Card Association's regulations and applicable law. If applicable, Merchant shall disclose to Cardholder before a card sale is made, that if merchandise is returned:
      (a) no refund, or less than a full refund, will be given;
      (b) returned merchandise will only be exchanged for similar merchandise of comparable value;
      (c) only a credit toward purchases will be given; or
      (d) special conditions or circumstances apply to the sale (e.g., late delivery, delivery charges, or other non-credit terms).
      (e) Merchant may not require a Cardholder to sign a statement waiving his or her rights to dispute the transaction.
   In the event that Merchant fails to disclose the foregoing a refund in the form of a credit to the Cardholder's card account shall be given. Disclosures shall be set forth on all copies of Sales Drafts or invoices in letters approximately 1/4" high in close proximity to the space provided for the Cardholder's signature or on an invoice issued at the time of the sale or on an invoice being presented for the Cardholder's signature.
   2.4 Merchant shall not process for payment any transaction(s) representing the refinancing of an existing obligation of a Cardholder including, but not limited to, obligations (i) previously owed to Merchant, (ii) arising from the dishonor of a Cardholder's personal check, and/or (iii) representing the collection of any other preexisting indebtedness.
   2.5 The Merchant shall not require Cardholders to provide any personal information such as home or business telephone number, a home or business address or driver's license number as a condition for honoring Cards unless such information is required under specific circumstances as or otherwise set forth herein.
   2.6 Merchant will not, under any circumstances, disclose any Cardholder's account number or any information relating to any Cardholder's account number or any Sales Drafts or Credit Vouchers which may have been imprinted with any Card to any person other than Bank, except as expressly authorized in writing by the Cardholder, Bank, or as required by law. Further, Merchant shall store any material containing Cardholder account information in a secure manner and destroy such information in the proper time in a fashion which renders such data unreadable.
   2.7 Merchant shall not require Cardholders to pay any part of any discount or charge imposed upon Merchant by this Agreement, whether through any increase in price or otherwise. Merchant shall not require a customer presenting a Card for payment to pay any charge not also required from a person paying cash or check. This term shall not, however, be construed as prohibiting discounts to customers for payments in cash.
   2.8 **Authorization**
      (a) Merchant will obtain an Authorization on all Transactions. Any Transaction which cannot be authorized electronically through a terminal will be subject to a Voice Authorization call. Merchant will obtain an authorization Code 10 prior to completing a Forced Transaction.
      (b) Merchant shall not complete any Card sale for which an Authorization has been declined. Any unauthorized Card Transaction is made with full recourse to Merchant, and Bank may charge back the amount of such Card sale to Merchant.
      (c) when the Terminal reads the magnetic stripe on the card, the Merchant will compare the embossed account number to the number displayed on the terminal or printed on the printer.
      (d) the Merchant will retain all Cards where the embossed account number, digit identification number, or encoded account number do not agree, and any valid Visa Cards or MasterCards which do not have a hologram on the lower right-hand corner of the face of the card. The Merchant will keep the card and place a Code 10 voice authorization.
      (e) if a Merchant which normally obtains Authorization through the use of a Point-of-Transaction Terminal is suspicious of Transaction and/or the validity of a Card or proper identity of a Cardholder or purported Cardholder and authorizes Member and requests a "Code 10" Authorization.
   2.9 Merchant acknowledges and agrees that except with respect to mail or phone orders if Merchant is authorized

(d) enter into any joint venture, partnership or similar business arrangement whereby any person or entity not a party to this Agreement assumes any interest in Merchant's business.

Failure to provide such notice shall be deemed a material breach hereof and shall constitute sufficient grounds for termination of this Agreement. In the event any of the changes listed above should occur after due notice, Bank shall have the option, at its sole discretion, to renegotiate the terms of this Agreement and/or provide thirty (30) days notice of termination.

2.16 Merchant agrees that Bank will be its sole provider of Card processing services during the term of this Agreement and any renewals or extension hereof.

2.17 Merchant shall be liable for repayment to Bank of all Chargebacks. Bank will comply with Card Association's prevailing regulations in processing any Chargebacks which result from Cardholder disputes. However, all disputes which are not or cannot be resolved through established Chargeback procedures shall be settled between Merchant and the Cardholder, and Merchant will indemnify Bank hold Bank harmless for all costs, expenses, claims, judgments including reasonable attorney's fees, which Bank may incur as the result of or in connection with any Cardholder dispute with respect to the Card Association rules and regulations.

2.18 Merchant shall not accept or deposit any fraudulent Transaction or a Transaction which Merchant has reason to believe is fraudulent or violation of any provision hereof and shall not, under any circumstance, present for processing or credit, directly or indirectly, a Transaction which originated with any other merchant or any other source. Should Merchant deposit any such Transaction, Merchant may, at Bank's sole discretion be immediately terminated and Bank may hold funds and/or demand an escrow pursuant to Section 8 and 4. Further, Merchant shall be subject to the Visa and MasterCard reporting requirements set forth in Section 8 5.

2.19 Merchant shall not deposit duplicate Transactions. Merchant shall be debited for any adjustments for duplicate Transactions and shall be liable for any Chargebacks which may result therefrom and for all costs incurred by the Bank in connection therewith.

2.20 Merchant shall not redeposit any Chargeback that has not been represented.

2.21 Payment of fees; Merchant's account will be debited for amounts set forth in Pricing Schedule A and Equipment Schedule B when Schedules are incorporated herein and made a part hereof are a part of this Agreement. Pricing may be adjusted under any of the following circumstances:
      (a) Any increase in interchange rates from the card association will be passed through to Merchant and shall become effective upon five (5) days written notice to Merchant.
      (b) Increase in long-distance communications costs and processing charges from third-party vendors may be reflected in increased discount rates upon five (5) days prior written notice to Merchant.
      (c) Non-Qualifying Transactions will be subject to the Non-Qualifying Rate, as set forth in section 1.14
      (d) Merchant's pricing is based upon the annual volume and average ticket stated in the Merchant Application. If the actual volume and average ticket during any ninety (90) day period is more than ten percent (10%) under the stated levels, Bank may adjust Merchant's discount and/or Transaction fees upon five (5) days prior written notice.

3. **Rights, Duties and Responsibilities of Bank**
   3.1 Bank will accept for purchase all Sales Drafts deposited by Merchant that comply with the terms and conditions of this Agreement. The electronic submission of sales Transactions to Bank through services provided by bank shall constitute an endorsement by Merchant to Bank of the Sales Drafts representing such Transactions. Bank will pay to Merchant the total face value amount of each Sales Drafts less discounts, fees, or adjustments determined daily or monthly, if any, at the case may be. All payments, credits and charges are subject to audit and final verification and review by Bank and prompt adjustment shall be made for inaccuracies discovered.
   3.2 Notwithstanding any other provision of this Agreement, Bank may refuse to accept any Sales Draft, or revoke its prior acceptance, in any of the following circumstances:
      (a) The sale giving rise to such Sales Draft was not in compliance with all terms and conditions of this Agreement including Card Association rules and regulations, as well as applicable laws, rules and regulations of any governmental authority; or
      (b) The Cardholder disputes his/her liability on any of the following grounds:
          (i) the Products covered by such sales draft were returned, rejected or defective in some respect or Merchant failed to perform any obligation in its part in connection with such Products, and Merchant has refused to issue a Credit Voucher in the proper amount;
          (ii) the signature on the Sales Draft was not that of an authorized user; or
          (iii) Merchant failed to obtain a signature on the Sales Draft and the cardholder claims he/she did not authorize the Transaction.
   In the event of a revocation of prior acceptance of a Sales Draft, Bank shall withdraw from the Account any amount previously paid to Merchant in respect of each such Sales Draft.
   3.3 If Bank requires funds to be held in reserve, as security to ensure proper performance of Merchant, they will be in the name of the Merchant.

4. **Account Monitoring**
   4.1 Merchant acknowledges and agrees that Bank will monitor Merchant's daily deposit activity. Merchant agrees that Bank may, upon reasonable grounds, suspend the disbursement of Merchant's funds for any reasonable period of time required to investigate suspicious or unusual deposit activity. Bank will make good faith efforts to notify Merchant of any such investigation in a timely fashion. Bank shall have no liability for any losses, either direct or indirect or consequential, which Merchant may incur due to or in connection with any suspension of funds disbursement.

5. **Warranties: Disclaimer of Warranties**
   5.1 Merchant unconditionally represents and warrants to Bank that all Sales Drafts submitted to Bank hereunder will represent the indebtedness of Cardholder with whom Merchant has completed a sales Transaction in the amount set forth therein for Products only, shall not involve any element which may be raised by a Cardholder to dispute, protest the charge or bring an action or claim against the Bank or the Merchant with respect thereto under the Card Association's rules, the Consumer Credit Protection Act (15 USC 1601) or other relevant state or federal statutes or regulations. Merchant shall indemnify and hold Bank harmless against any claim, dispute, protest, claim or action. Further, Merchant represents and warrants that any Credit Voucher which it issues represents a bona fide refund or adjustment on a Card sale by Merchant with respect to which a Sales Draft has been accepted by Bank.
   5.2 Merchant represents and warrants that all information contained in the Merchant Application, including Merchant's annual volume and average ticket, to be valid and true.

6. **Limitation of Liability; Indemnification; Due Care**
   6.1 Bank shall have no liability whatsoever for any negligent design or manufacture of any point-of-sale terminal, printer or other equipment provided by third parties. BANK MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, CONCERNING ANY EQUIPMENT, OR ANY SERVICE PROVIDED BY OTHERS AND, IN PARTICULAR, MAKES NO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE.
   6.2 Merchant shall indemnify and hold Bank harmless from and against all liability, loss and damage which Bank might sustain or incur as a consequence of or in connection with any claim made against Bank or by any third party arising out of any agreement to permit Merchant to accept other financial services through point-of-sale terminals provided by third parties.
   6.3 Merchant shall indemnify and hold Bank harmless from all liability, loss and damage, including reasonable attorney's fee and costs which may arise as a result, whether direct or indirect, of any act or failure to act or the breach of any warranty by Merchant pursuant to the terms of the Agreement and the Card Association's operating rules and regulations.
   6.4 Bank will use due care in providing services covered by this Agreement and the performance of all services hereunder shall be consistent with industry standards. Bank shall in no event be liable to Merchant for incidental or consequential, exemplary or punitive damages or for any loss of profits in connection herewith.

7. **Display of Materials; Trademarks**
   7.1 Merchant agrees to prominently display the promotional materials provided by Bank in its place(s) of business. Use of promotional materials and use of any trade name, trademark, service mark or logo type ("Marks") associated with Card(s) shall be limited to informing the public that Card(s) will be accepted at Merchant's place(s) of business. Merchants' use of promotional materials and Marks is subject to the direction of Bank.
   7.2 Merchant may use promotional materials and Marks during the term of this Agreement pursuant to the terms and provisions hereof and the Card Association's rules and regulations and shall immediately cease such use and return any inventory of promotional materials to Bank upon the expiration or earlier termination hereof.
   7.3 Merchant shall not use any promotional materials or Marks associated with Visa or MasterCard in any way which suggests or implies that either endorses any products sold by Merchant.

8. **Term: Termination.**
   8.1 The initial term of this Agreement shall be as set forth on the Merchant Application and shall begin on the date of the first deposit of Transactions from Merchant. Thereafter, the Agreement shall automatically renew for additional one-year period, unless terminated by either party upon five (5) days written notice prior to the expiration date of the then current period.
   8.2 This Agreement may be terminated by either party for a material breach hereof provided the breaching party has been given five (5) days prior written notice stating the nature of said breach, during which time Merchant shall be given opportunity to cure such breach.
   8.3 This Agreement may be immediately terminated by Bank for the following reasons if the Bank has: (a) Reasonable belief that Merchant is employed in practices that involve elements of fraud or that are deemed to be injurious to Cardholders; (b) Reasonable belief that Merchant will constitute a continuing financial risk to Bank by failing to meet the terms of Agreement; or (c) has deposited transactions for the purpose of securing cash advances in violation of the terms set forth in section 2.14.
   8.4 In the event of termination regardless of cause, Merchant expressly authorizes Bank to withhold and discontinue the disbursement for all Cards and other payment transactions of Merchant in the process of being collected and deposited. Collected funds will be placed in an escrow account at Bank until Merchant pays any equipment cancellation fees and any outstanding charges, losses and/or other sums due and owing to the Bank hereunder. Further, Bank reserves the right to require Merchant to deposit additional amounts based upon Merchant's processing history and/or anticipated risk of loss to Bank into said escrow account.

The aforesaid escrow amount shall be maintained a minimum of one hundred eighty (180) days after the termination date and for any reasonable period thereafter during which cardholder disputes may remain valid under the Card Associations' rules and regulations. Any balance remaining after Chargeback rights have expired will be disbursed to Merchant and/or set off deduction of any sums due and owing to Bank hereunder.
   8.5 If Merchant is terminated for cause, Merchant acknowledges and agrees that Bank is required to and shall report Merchant's business and the names of its principals to the Combined Terminated Merchant File maintained by Visa and MasterCard. Merchant expressly agrees and consents to such reporting in the event Merchant is terminated for any of the reasons specified as cause by Visa and MasterCard. Furthermore, Merchant shall hold harmless Bank for any and all claims, losses, damages and the like including consequential and exemplary damages which Merchant may incur as a result of such reporting.

Case 0:01-cv-07693-NCR   Document ...   Entered on FLSD Docket 10/09/2001   Page 32 of 33

(e) hologram on the lower right-hand corner of the face of the card. The Merchant will keep the card and place a Code 10 voice authorization.

If a Merchant which normally obtains Authorization through the use of a Point-of-Transaction Terminal is suspicious of Transaction and/or the validity of a Card or proper identity of a Cardholder or purported Cardholder, the Merchant shall call its Authorizing Member and request a "Code 10" Authorization.

2.9 Merchant acknowledges and agrees that except with respect to mail or phone orders if Merchant is authorized to accept the same, Bank shall have full recourse to charge back the amount of a Card sale for which an imprint of the Card is not obtained or, the signature of the Cardholder is not obtained. Merchant acknowledges and agrees that in all cases, the Bank shall have full recourse to charge back amount of a card sale if Cardholder disputes the transaction on the grounds that he/she did not authorize the charge.

2.10 Merchant agrees to electronically deposit Sales Drafts and Credit Vouchers not later than the close of business of the Transaction date. Any Non-qualifying Transaction shall be subject to the surcharge listed in Pricing Schedule A.

2.11 Merchant shall unless otherwise specified on the merchant agreement, at all times maintain an Account at Bank. All credit for collected funds and debits for fees, payments and Chargebacks under the terms of the Agreement shall be made to the Account. Merchant may not close or change the Account without fifteen (15) day's prior written notice to Bank hereby grants to Bank a security interest in and right to set-off against the Account to the extent of any and all fees, payments and Chargebacks which may arise under this Agreement. If Merchant maintains the Commercial Account with another institution, as detailed on the Merchant application, Merchant hereby authorizes Bank to present Automated Clearing House ("ACH") credits and debits for the payment of funds due to or due from Merchant. Merchant agrees that, if the application details another financial institution of Merchant's choice, then Merchant agrees that this fund transfers authorization will include the right for Bank to process fund transfers for any and all Merchant obligations to Bank, including, but not limited to, discount fees, processing fees, transaction fees, service charges, penalties, chargebacks and adjustments, pursuant to the terms of this Agreement, including all addenda, amendments, revisions and periodic disclosures thereto. This authorization shall remain in effect for one year (365 days) following the effective date of any cancellation of this Agreement that is received by Bank from Merchant under the terms herein. Bank will assess to Merchant a service fee of $10.00 for each debit that is rejected by Merchant's financial institution and returned to Bank unpaid. Merchant will reimburse Bank, immediately upon demand, for any debit that cannot be processed against Merchant's Commercial Account as an ACH debit for any reason. Daily ACH credit transactions will be processed to Merchant's designated financial institution, via the Federal Reserve System, with an effective date that will correspond with the reference to the "Available Funds" time frame described in section 5A above. Merchant agrees that, in the event of a second or subsequent occurrence of a debit that is rejected by Merchant's financial institution and returned to Bank unpaid, Bank reserves the right to terminate Merchant's ACH arrangement and require Merchant to establish a Commercial Account directly with Bank. Under such a Commercial Account relationship, Merchant agrees to adhere to then current Bank requirements controlling such accounts.

2.12 Merchant assumes the responsibility for storage of all Sales Drafts and Credit Vouchers. Should bank request any such documentation from Merchant, Merchant's failure to provide Bank with the requested documentation within five (5) days after receipt of such request shall result in a charge back to Merchant in the amount of the corresponding transaction, and Bank shall have the right to debit the Account for full amount thereof.

2.13 Merchant shall pay all costs and fees incurred in connection with the preparation of the site(s) for installation of electronic data capture terminals and/or peripheral equipment.

2.14 Merchant shall not deposit any Sales Draft or Credit Voucher for the purpose of obtaining or providing a cash advance. Merchant acknowledges and agrees that any such deposits shall constitute grounds for immediate termination of this Agreement.

2.15 Merchant shall provide Bank with immediate notice of its intent to:

(a) transfer or sell any substantial part of its total assets, or liquidate;

(b) change the basic nature of its business, including the sale of any products or services related to its current business;

(c) change ownership or transfer control of its business; or

8.5 If Merchant is terminated for cause, Merchant acknowledges and agrees that Bank is required by ... and shall report Merchant's business and the names of its principals to the Combined Terminated Merchant file maintained by Visa and MasterCard. Merchant expressly agrees and consents to such reporting in the event Merchant is terminated for any of the reasons specified as cause by Visa and MasterCard. Furthermore, Merchant shall hold harmless Bank for any and all claims, losses, damages and the like including consequential and exemplary damages which Merchant may incur as a result of such reporting.

## 9. Notices

9.1 All notices and other communications required or permitted under this Agreement shall be deemed delivered when mailed first class mail, postage prepaid, to the Bank.

## 10. Additional Terms

10.1 **Card Associations:** This Agreement is subject to the bylaws, rules and regulations promulgated by Visa and MasterCard or any other applicable Card Association. The parties hereto shall be bound by and shall fully comply with such bylaws, rules and regulations and by amendments or additions as may be made thereto.

10.2 **Inspection of Books and Records:** Representatives of Bank may, at their discretion during normal business hours, inspect, audit and make copies of Merchant's books, accounts, records and files pertaining to any Card Transaction. Merchant will preserve its records of any Card sale Chargeback refund and/or credit adjustment thereon for at least seven (7) years from the date of such sale, Chargeback refund or adjustment.

10.3 **Force Majeure:** Bank shall not be liable for damages resulting from and delay in performance or nonperformance caused by circumstances beyond Bank's control including, but not limited to, act of God, fire, flood, war, governmental action, accident, labor trouble or shortage, inability to obtain equipment, parts, service or transportation, or other events of similar effect in connection with Bank's obligations therein.

10.4 **Amendment:** Except as otherwise expressly stated herein, this Agreement contains the entire understanding of the parties with respect to its subject matter and may not be modified except by a subsequent written instrument executed by both parties hereto.

10.5 **Section Headings:** All section headings contained herein are for descriptive purposes only, and the language of such section shall control.

10.6 **Assignability:** This Agreement may not be assigned, directly or by operation of law, without the prior written consent of Bank.

10.7 **Attorney's Fees and Costs:** Merchant shall be liable for and shall indemnify Bank for any and all attorneys' fees and other costs and expenses paid or incurred by Bank in the enforcement hereof, or in collecting any amounts due from Merchant to Bank hereunder or resulting from any breach by Merchant of any of the terms or conditions of this Agreement.

10.8 **Binding Effect; Governing Law; Jurisdiction and Venue:** Any claim, controversy, action or proceeding arising out of or in connection with this Agreement shall be resolved before a court of competent jurisdiction sitting in Dade County, Florida. This Agreement shall be construed and governed by the laws of Florida without regard to the conflict of laws provisions thereof. If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the remaining provisions shall remain effective and binding to the full extent permitted by law.

10.9 BANK AND MERCHANT HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, AND ANY OTHER AGREEMENT OR DOCUMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OR CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF EITHER PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE BANK EXTENDING CREDIT TO AFFILIATED COMPANIES. FURTHER, GUARANTOR HEREBY ENTERING INTO THIS AGREEMENT. NO REPRESENTATIVE OR AGENT OF THE BANK, NOR THE BANK'S COUNSEL, HAS REPRESENTED EXPRESSLY OR OTHERWISE. THAT BANK WOULD NOT, IN THE EVENT OF SUCH LITIGATION, SEEK TO ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL PROVISION.

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**CIV-HUCK**

## I (a) PLAINTIFFS

WEBSITE BILLING.COM, INC.

01 OCT -4 PM 4: 45

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA - MIA

## DEFENDANTS

VISA U.S.A., INC. and VISA INTERNATIONAL
SERVICE ASSOCIATION, INC.

**MAGISTRATE JUDGE
BROWN**

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

Abroward 01CW 7563 Huck Brown

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Kluger, Peretz, Kaplan & Berlin, P.A.
201 S. Biscayne Blvd., Miami, FL  33131
Tel.: 305 379 9000

ATTORNEYS (IF KNOWN)

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:
DADE, MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN × IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN × IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

**IVa.** __7__ days estimated (for both sides) to try entire case.

## V. NATURE OF SUIT (PLACE AN × IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | B FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury— Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |

## VI. ORIGIN (PLACE AN × IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Refiled
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

**DEMAND $**

Check YES only if demanded in complaint:
**JURY DEMAND:** ☐ YES ☒ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE _____ DOCKET NUMBER _____

DATE
October 4, 2001

SIGNATURE OF ATTORNEY OF RECORD

---

**FOR OFFICE USE ONLY:** Receipt No. 850727   Amount: 150.00

Date Paid: 10/04/01   M/ifp: _____

UNITED STATES DISTRICT COURT
S/F  I-2
REV. 6/90